Weaver v. Lapsley.

# WEAVER *vs.* LAPSLEY.

[ACTION ON A CONTRACT FOR SALE OF SLAVES.]

1. *When a note, with condition, may be declared on as an absolute promise to pay money.*—It is a sufficient description of a note sued on, to omit to set forth the manner of payment prescribed in the note, unless the omission can be taken advantage of as a variance ; and when the stipulation, as to the manner of payment is for the benefit of the defendant, it is the settled law of this State, that if, in such case, the maker neglects to avail himself of the privilege inserted for his benefit, according to its terms, the note becomes an absolute promise to pay money.

2. *When evidence of the value of bank-bills is irrelevant and immaterial.*— Where the defendant was, according to his contract, authorized to discharge a note in bills of a certain bank, *within a fixed period,* and he fails to show on the trial, a compliance or offer to comply with its terms, testimony tending to show the value of such bank-bills is irrelevant and immaterial.

3. *What may be given in evidence as part of the res gestæ.*—The plaintiff, when testifying as a witness in his own behalf, was asked to state the circumstances under which the note sued on was given. In answer to this question, he commenced by stating that, *some days before the contract* between himself and the defendant was made, the defendant told him that Eliza and Caroline, the subjects of the contract, were "family servants." This evidence was held admissible as showing the com-

38

mencement of the negotiation between the parties which resulted in the making of the contract sued on. So, "the statement of the same witness objected to, ' that the wife of the defendant had had said negro girls in her possession,' was also relevant as showing a motive on the part of the defendant for purchasing them, and desiring to take the title in his wife's name ;" at the most, it would be *damnum absque injuria.*

4. *Admissibility of a promissory note not sued on, as evidence explanatory of the transaction from which the cause of action originated.*—A note payable "in Confederate treasury-notes," *though not in suit*, may, when shown to be connected with another note sued on, being in part consideration of the purchase for which the latter was given, be read in evidence as a part of the transaction.

5. *When a contract of sale is not conditional.*—Where L. delivers the possession of certain slaves to W., at a fixed price, agreed to be paid for them, with the stipulation that the purchase-money should be paid *at a future day*, and that on its payment, the vendor should make "proper titles" to the wife of the vendee, this was held *not* to be a conditional sale, but a transfer of the property with a *security* intended to operate as a *chattle mortgage.*

6. *Manumission of slaves under the proclamation of President Lincoln, of September 22d, 1862 ; effect of.*—"The proclamation of President Lincoln, issued by him, as 'President of the United States and Commander-in-Chief of the Army and Navy thereof,' declaring the universal manumission of all persons held as slaves within the seceded States,—*held,* to have been a war measure, and of no *operative* effect until carried into execution by force of arms."

APPEAL from the Circuit Court of Dallas.
Tried before the Hon. JOHN MOORE.

THIS was an action instituted on the 13th day of March, 1866, by the appellee against the appellant, in the circuit court of Dallas, founded on an instrument in writing, as follows, viz :

"SELMA, ALA., Feb. 1st, 1865.

$2,030 00. Thirty days after date I promise to pay J. W. Lapsley, or his order, two thousand and thirty dollars for value received. It is understood and agreed that this debt may be paid in notes of any of the chartered banks of the State of Alabama, or of the bank of Selma, if paid at maturity, or within thirty days thereof."

The complaint was "in compliance, substantially, with the form prescribed by the Code for an action by the payee against the maker of a note."

The pleas of defendant, in short by consent, were : "1. Non-assumpsit. 2. Want of consideration. 3. Failure of consideration, with leave to give in evidence any matter which could be specially pleaded or replied.".

Said writing being offered to be read in evidence by the plaintiff in support of his action, was objected to by defendant : " 1st. Because it varied from the contract described in the complaint. 2d. Because the contract stated in the complaint is a promissory note without conditions, and the contract offered in evidence has conditions and stipulations not mentioned in the complaint," which objection was overruled, and defendant excepted. The contract was then read, and " here" the plaintiff "rested" his case.

The defendant then introduced one Street as a witness, and " asked said witness to state whether or not he was acquainted with the value of the notes of the chartered banks of the State of Alabama, in Selma, on the first day of February, 1865." " The plaintiff objected to the question because it was irrelevant," and " the court sustained the objection," and defendant excepted.

" The defendant then offered to prove by said witness the value of the notes of the bank of Selma on the first of March, 1867," and to this evidence the plaintiff objected, which objection the court sustained, and defendant excepted. " The defendant then asked the witness to state, if he knew the value of the notes of the bank of Selma on the 1st day of February, 1865, and the plaintiff objected to this question as irrelevant, which objection the court " likewise sustained," and defendant excepted.

" The defendant thereupon introduced as a witness the plaintiff, who testified that the consideration of the contract sued on was two slaves (girls,) * * * * and that the note sued on was without any other consideration," and " in answer to question of defendant's counsel, witness stated that defendant had never, at any time, offered to pay said note in any way."

" The plaintiff's attorney then asked the plaintiff to state the circumstances under which the note sued on was given," in answer to which, " plaintiff testified, that some days before the contract sued on was made, the defendant told

witness that said girls, (slaves,) Eliza and Caroline, were ' family servants.' " To this statement, as evidence, defend-- ant objected and moved to exclude the same from the jury, which objection and motion being overruled by the court, he excepted.

" The plaintiff then testified that before the contract sued on was made, the defendant told the plaintiff the said slaves Eliza and Caroline were 'family servants,' and that he want- ed to buy them, but that he did not have the money to pay for them ; and that at the time, the plaintiff told the de- fendant, that if he, the defendant, should bid off the said girls at the sale, that the plaintiff would take his note *with the same stipulations* as shown by the notes and other papers executed between the parties to this suit, at the time the note was made," and that the defendant assented, and au- thorized the plaintiff to bid off the girls for him with that understanding." The plaintiff then further testified, "that the wife of the defendant had had said negro girls in her possession." To this last statement the defendant objected as illegal and irrelevant, and moved the court to exclude the same, but the court overruled his objection and motion, and allowed it to go to the jury, and defendant excepted.

" The plaintiff then testified, on cross-examination, that he sold said negroes to the highest bidder at public out- cry, in Selma, on the 1st day of February, 1865, under a deed from Robert Johnson and wife," and, " that at said sale he announced publicly, ' that the sale was for coin.' " " To this last statement, to-wit : ' that the sale was for coin,' the defendant objected and moved the court to exclude the same as illegal and irrelevant evidence, but the court over- ruled the objection and motion, and defendant excepted."

" The plaintiff further testified, in answer to questions of his attorney, that said negro girls were bid off by the plain- tiff for the defendant, under and in accordance with the previous arrangement made with the defendant as hereto- fore stated ;" and that "the note sued on was made, and also another note made by the defendant, and also another writing signed by the plaintiff and delivered to the de- fendant ; that the price said negroes were bid off at was

$2,172 00 ; that the said slaves on the day they were bid off, went into possession of the defendant."

Thereupon the writing referred to above, other than the notes, after proving its execution on the 1st day of February, 1865, was read in evidence to the jury, by the defendant, and among other things therein contained, reads as follows : " This is to show and certify that Leroy G. Weaver has this day purchased the two negro girls Eliza and Caroline, sold by me at public auction, under and by virtue of a mortgage executed to me by Robert Johnson and his wife Caroline Johnson. To indemnify me as their security on a note of fifteen hundred dollars, &c.," * * * * * * the said Weaver has executed to me his note of this date for two thousand and thirty dollars, for the sum for which said negroes were purchased by him at said sale. Now, be it hereby known that, in accordance with the agreement now hereby made with said L. G. Weaver, proper titles for said negro girls under said mortgage and sale will be made; and I bind myself to make the same to Mrs. Margaret Le Grand Weaver, wife of said Leroy G. Weaver, on the payment of said note, until which payment, the title to remain in me. Given under my hand and seal, this first day of February, 1865. The said note is dated this day, and payable thirty days after date, with conditions that the same may be paid in notes of any of the chartered banks of the State of Alabama, or of the bank of Selma, if paid at maturity, or within thirty days thereafter.

(Signed,)  J. W. LAPSLEY, [seal.]"

" The defendant then proved by witness, facts tending to show that in the year 1864, the said slaves were worth in Confederate States treasury-notes, about $5,000, and that $5,000 of Confederate States treasury-notes were worth, in gold, about $250 ; that after that time, slaves declined in value, and in February, 1865, it was difficult to sell slaves at any price ; that there were no sales of slaves, so far as witness heard, in 1864 or 1865." " Here the defendant closed his evidence."

" The plaintiff then proved the signature of Leroy G. Weaver to the following writing, and offered the same in evidence :"

"Thirty days after date I promise to pay J. W. Lapsley one hundred and forty-two dollars for value received, payable in treasury-notes of the Confederate States, new issue. Selma, Feb'y 1, 1865.

(Signed,)                      L. G. WEAVER."

"The defendant objected to the reading of said writing last copied as evidence, as illegal and irrelevant, but the court overruled his objection, and allowed said writing to be read; to which ruling defendant excepted." "The plaintiff, thereupon, was again introduced as a witness for himself, and testified that the three writings which are copied above, were all executed at the same time, and together constituted the entire contract between himself and the defendant in reference to the sale of said negroes; that the note for $142, above copied, was given as a part of the price of the slaves, and it was made payable in Confederate treasury-notes because that was the amount of the expenses of said sale, and the expenses of the sale could be paid in Confederate money; that defendant never offered to pay either of said notes, and that the plaintiff never made title to Mrs. Le Grand Weaver."

The foreging was all the material evidence in the cause. Thereupon, "the court charged the jury, at the request of the plaintiff, that, if they believed the evidence, and that there was no agreement to the effect that the note sued on should be paid in Confederate money, then they must find for the plaintiff, and assess his damages at two thousand and thirty dollars and interest on that sum from the time the note was payable," to which charge defendant excepted.

"The defendant then asked the court, in writing, to charge the jury, that, if they believe the evidence, the plaintiff is not entitled to recover the full amount of the note and interest." But the court refused to give the charge asked by the defendant, and defendant excepted to such refusal of the court to give said charge.

"The defendant then asked the court, in writing, to charge the jury that, if they believe the evidence, the plaintiff is not entitled to recover," which charge the court likewise refused to give, and defendant excepted. Whereupon "the defendant, in writing, asked the court to charge

the jury that the papers read in evidence, if executed at the time and between the same parties, then the plaintiff can not recover," which charge the court also refused to give, and the defendant excepted.

The sustaining of the several objections of the plaintiff to the testimony of the witness Street, and to the questions put to him ; the overruling the objections of defendant below to the introduction of the contract which was read in evidence ; the overruling the several objections of the defendant below to the statement of the witness Lapsley ; the overruling of the objection of defendant below to introducing the note for Confederate money ; the giving of the charge asked by the plaintiff below, and the refusal to give the charges asked to be given by the defendant below, as shown in the bill of exceptions, are assigned as errors.

This cause was, at the term of the supreme court in April, 1868, submitted on briefs of counsel and affirmed. On the 30th day of May, of that year, the affirmance was set aside, a re-hearing granted and argument requested. In July following, the judgment below was again affirmed, as appears by the record.

PETTUS & DAWSON, and THOS. B. WETMORE, for appellant.
MORGAN & LAPSLEY, *contra*.

Counsel for appellant contended :

1. That there was a fatal variance between the contract declared on and that proven, citing 1 Chitty's Pl. 305, 7 & 8 ; and that though a description of a contract, according to its *legal effect*, is generally sufficient, it must be according to its legal effect *when made ;* that if a promise be made to do one of two things at the election of the promissor, the declaration must correctly describe the promise in the alternative, although the party made his election before suit- and that, in the cases apparently to the contrary, the question of variance was not raised.

2. That the sale, as shown by the evidence, was conditional and not a contract in the nature of a mortgage ; that there can be no mortgage unless the title to the chattel is in the

mortgagor, and that, under the contract in question, Lapsley retained the legal title to the slaves; that the facts shown in this case are not similar to a sale of land on credit, with bond for title; that the rule is entirely different in regard to realty; as, in that case, *no title can pass* except by written words of grant; whereas, he who sells and delivers a chattel can not retain title unless he contract to do so; and that he can not retain the title, even then, *by contract*, if he has received the price.

In support of which several positions taken by appellant's counsel, they referred to the cases of *Gaither v. Teague*, 7 Iredell, 460; *Leheigh Coal Co. v. Field*, 8 Serg't & Watts, 232; *Ellison v. Jones*, 4 Iredell, 48; *McBride v. Whitehead*, Geo. Decis., part 1, 165; *Seawell v. Henry*, 9 Ala. 34; *Bryant v. Cosby*, 36 Maine, 562; and 20 Barber, 364. Further, that "the promise to pay, and the covenant to make titles, are dependent covenants. Weaver could not demand titles, without showing a performance on his part, or a tender and refusal. Lapsley, on the other hand, could not recover without making his part of the agreement precedent, by showing that he was able and offered to make titles," as in *Wadlington v. Hill*, 10 Sm. & M. 560, and cases there cited. See also, 1 Peters, 465; *Robertson v. Davenport*, 27 Ala. 574; 1 Salk. 171; 4 Term R., m. p. 761; 15 Johns. 500; 11 Wendell, 48; 5 Pick. 395; 3 Hill S. C. 268; Doug. 664 and 665; 7 Term R. 125, and 1 East, 203.

3. That the contract being conditional, and Lapsley being unable to comply with his part of the undertaking, there is, therefore, an entire failure of consideration; at any rate, appellant is entitled to the value of the slaves if he pays for them, notwithstanding their manumission.—See United States Digest, Vol. 1, 457, and 2 Bay, 108.

4. That the evidence in this case tended to show fraud on the part of the plaintiff below, and that the general charge of the court was erroneous because it, in effect, excluded any fraud from the consideration of the jury.

5. It was submitted that there could be no legal sale of slaves in Alabama, at that time, in virtue of the act of congress, approved July 17th, 1862, and the proclamation of President Lincoln of September 22d, 1862.

Weaver v. Lapsley.

MORGAN & LAPSLEY, *contra.*—1. "This contract is not a conditional sale as contended by appellant, as is shown by the instruments themselves, and by all the evidence set out in the record. 'The precise language used is generally held of little consequence,' and the instrument is to be construed in the light of all surrounding circumstances."—See Hilliard on Mortgages, 85, and *Gaither v. Teague*, 7 Iredell, 460. "Here the sale and delivery to Weaver were completed, and then, by the same instrument, the parties agree that Lapsley should retain or retake the title and hold in trust for Mrs. Weaver till the purchase-money was paid, &c. It is identical with a bond for titles, and the courts universally designate them as equitable mortgages.—See *Parker v. Kelly*, 10 Smed. & M. 184 ; also citing the case of *Brewster v. Baker*, 16 Barb. 618 ; but note same case reversed as reported in 20 Barb. Rep.

2. "If a conditional sale, it was a condition which the vendee bound himself to perform, * * * * and he will not be allowed to assert that by his own breach of the contract of sale, he has deprived the other party of his rights, &c."

3. "There was nothing more to be done by Lapsley in order to fix the title in Mrs. Weaver. Weaver's payment of the note, without any thing more, would have settled that matter conclusively."

4. "It was not necessary for Lapsley to tender title or bill of sale before bringing suit, even if necessary to fix the title. The promise to pay the note was independent, and a condition precedent.—Addison on Cont's, p. 202, and cases there cited ; also *Bright v. Rowland*, 3 How. Miss. R. 415, and *Manning v. Brown*, 10 Maine (3 Tairf.) 49."

5. "The execution of the promise by Lapsley to make title, &c., and the delivery of possession, are sufficient considerations for the note.—*Manning v. Brown, supra.*"

JUDGE, J.—The plaintiff below, (appellee,) declared against the defendant, (appellant,) as upon a promissory note for the sum of two thousand and thirty dollars, dated February 1st, 1865, and payable thirty days after date. The plaintiff offered in evidence to sustain his action, an instrument of writing signed by the defendant, of which the following is a copy :

" SELMA, ALA., 1st Feb. 1865.

2,030 00. Thirty days after date I promise to pay J. W. Lapsley, or his order, two thousand and thirty dollars for value received. It is understood and agreed that this debt may be paid in notes of any of the chartered banks of the State of Alabama, or of the bank of Selma, if paid at maturity, or within thirty days thereof."

The defendant objected to the introduction of this instrument in evidence, because of the variance between it and the instrument described in the complaint; and "because the contract stated in the complaint is a promissory note without any conditions, and the contract offered in evidence has conditions and stipulations not mentioned in the complaint."

The complaint is in compliance, substantially, with the form prescribed by the Code for an action by the payee against the maker of a note, and must be held to be sufficient description of the note offered in evidence, unless the omission to set forth the manner of payment prescribed in the note can be taken advantage of as a variance.

The stipulation as to the manner of payment, was clearly for the benefit of the defendant; and it is the settled law of this State, that if, in such case, the maker neglects to avail himself of the privilege inserted for his benefit, according to its terms, the note becomes an absolute promise to pay money; and that a complaint which so describes it, conforms to its legal effect, and is sufficient—*McRae v. Raser*, 9 Porter, 122; *Nesbit v. Pearson's Admr's*, 33 Ala. 668, and cases there cited.

The evidence offered by the defendant to show the value of the notes of the chartered banks of the State of Alabama, and of the bank of Selma, at the date of the maturity of the note sued on, was properly excluded by the court on the ground of irrelevancy; the defendant not proposing to connect it with any evidence, showing, or tending to show, a compliance, or an offer to comply, on his part, with the condition of the note, that it might be discharged by the payment in such bank notes. It is true such proof might have had a remote tendency to show the value of the

slaves ; but this value had been fixed by the express contract between the parties, and does not appear to have been a material question in the cause under any legitimate ground of defense which had been interposed.

While the plaintiff was testifying as a witness in his own behalf, he was asked to state the circumstances under which the note sued on was given. In answering this question, he commenced by stating that some days before the contract between himself and the defendant was made, the defendant told him that Eliza and Caroline, the subjects of the contract, were "family servants;" at which stage of the narrative, the defendant interposed by his counsel, objected to the statement the witness had made, and moved the court to exclude it from the jury. The motion to exclude was overruled, and the plaintiff proceeded with his statement, saying that the defendant had told him that Eliza and Caroline were family servants, and that he wanted to buy them, but had not the money, &c.

We can perceive no error in the refusal of the court to exclude this testimony. The conversation in which the declaration was made seems to have been the commencement of the negotiation between the parties which resulted in the making of the contract sued on. Furthermore, it was a declaration of the defendant relating to the subject-matter of the suit, and disclosed a reason for the defendant's desire to purchase the property.

The evidence of the same witness objected to, " that the wife of the defendant had had said negro girls in her possession," was also relevant as tending to show a motive on the part of the defendant for purchasing them, and for desiring to take the title in his wife's name. But if this testimony was irrelevant, it is difficult to perceive how its admission could possibly have resulted in injury to the defendant.

*        *        *        *        *        *        *

The plaintiff further stated in his testimony, that he sold said negro girls to the highest bidder at public out-cry, and that he publicly announced at the sale, " that the sale was for coin." The statement that such was the announcement at the sale, was objected to by the defendant, who moved

to exclude the same, on the ground that it was illegal and irrelevant evidence. This evidence was admissible on the principle of *res gestœ*.

The plaintiff, after proving the signature of defendant thereto, offered a writing in evidence, of which the following is a copy: "Thirty days after date I promise to pay J. W. Lapsley one hundred and forty-two dollars for value received, payable in treasury-notes of the Confederate States, new issue. Selma, Feb'y 1, 1865."

The defendant objected to the introduction of this evidence on the ground that it was illegal and irrelevant. The court overruled the objection and allowed it to be introduced. The plaintiff then proved that said note for $142 00 was given for a part of the price of said slaves, and that it was made payable in Confederate treasury-notes, because that was the amount of the expenses of the sale, which could be paid in said currency.

The note being thus connected with the sale, was admissible in evidence as a part of the transaction.

It is contended by counsel for appellant that the general charge given by the court, and the refusals to charge as requested, raise several questions upon each of which he insists error intervened to his prejudice; they will be noted separately:

*First*, it is insisted that the charge given was erroneous, because of the variance between the contract described in the complaint, and that which was proved. This question we have already considered and disposed of.

*Second*, the plaintiff having retained the *title* to the slaves, under an agreement to convey the same to the wife of the defendant, when the purchase-money should be paid, it is insisted that the contract amounted to nothing more than a *conditional sale*, under which the right of property never vested in the purchaser; and that inasmuch as the slaves have been emancipated no title to them can ever be made, and, consequently, no recovery can be had of the purchase-money. The contract between the parties was not a stipulation *to sell at a future day ;* but was an absolute sale, accompanied by a delivery of the property, with a stipulation that the purchase-money should be paid at a

future day, and that on its payment, the vendor should make " proper titles" to the wife of the vendee.

We can not hold such a contract to be a *conditional* sale. If the retention of the title by the plaintiff had any effect, it was simply to give him a security for the payment of the purchase-money, in the nature of a mortgage. By the emancipation of the slaves, the defendant lost his property in them, and the plaintiff lost the equitable lien retained by him upon them, as a security for the payment of the purchase-money. There is a striking analogy between a contract like the one we are considering, and a contract for the sale of realty where the vendor executes his bond conditioned to make titles on the payment of the purchase-money. In the latter case, a court of equity considers the contract as being a conveyance to the purchaser, and a reconveyance back by way of mortgage to secure the payment of the purchase-money.—*Cannon v. Banks*, 18 Ala. 42; *Kelly v. Payne*, ib. 371.

The inclination of the courts has always been against conditional sales, because an error which converts a conditional sale into a mortgage, is less injurious than an error which changes a mortgage into a conditional sale.—*Locke's Executor v. Palmer*, 26 Ala. 312. To hold the contract before us to be a conditional sale, would be to allow the defendant to avoid his obligation by his own *laches* ; for, as the record discloses, had he paid the purchase-money, according to his contract, the plaintiff could have made the title according to his stipulation.

*Third*, it is contended that the effect of the act of congress of July 17th, 1862, and of the proclamation of President Lincoln, of September 22d, 1862, was to render the sale of the slaves made in the present case illegal and void.

Section 9 of the act of congress above cited—which is the portion of the act relied on by the appellant—did not undertake to free of their servitude, the slaves, generally, of persons who might thereafter be engaged in rebellion against the government of the United States; but it declared that all slaves of such persons, "escaping and taking refuge within the lines of the army," and " all slaves cap-

tured from such persons, or deserted by them and coming under the control of the government of the United States," and "all slaves of such persons found or being within any place occupied by rebel forces, and afterwards occupied by the forces of the United States," should "be deemed captives of war; and should be forever free of their servitude, and not again held as slaves."

The record does not disclose that Eliza and Caroline, the sale of whom gave rise to the present controversy, were of either of the class of slaves designated by the act of congress ; and consequently, said act has no application to the present case. If it did have application, then a constitutional question would be presented, which it is not now necessary either to discuss or decide.

As to the proclamation of President Lincoln, issued by him, as " President of the United States, and Commander-in-chief of the Army and Navy thereof," declaring the universal manumission of all persons held as slaves within any of the seceded States, we have to say, that it was manifestly nought but a war-measure, and of no operative effect, until carried into execution by force of arms.—(*Ferdinand v. The State*, 39 Ala. 706). Such is believed to be the opinion of enlightened jurists and publicists, in all sections of the Union.—(Laurence's Wheaton on International Law, notes on pages 597 to 617 ; see, also, Dana's Wheaton, note m. p. 441 inclusive). This proclamation, therefore, can bring no aid to appellant.

*Fourth*, it is insisted that the general charge to the jury, " that if they believed the evidence, and that there was no agreement to the effect that the note sued on should be paid in Confederate money, that then they must find for the plaintiff, and asses his damages at two thousand and thirty dollars, and interest on that sum from the time the note was payable," excluded from the consideration of the jury the facts and circumstances in the case, tending to show *fraud* on the part of the plaintiff, in the sale of the slaves to the defendant; the principal facts relied on to show such fraud, being the disproportion between the value of the slaves, and the contract price, coupled with the further fact that the plaintiff was both buyer and seller—

seller for himself, and buyer *as agent* for the defendant. It is true the law exacts from one occupying such a relation, the utmost degree of good faith—*Jazan v. Toulmin,* 9 Ala. 662—but, after a careful examination of the record, we are unable to discover that the plaintiff did not thus act towards the defendant throughout the transaction.

The bill of exceptions informs us, in effect, that the plaintiff was the mortgagee of the slaves from Robert Johnson and wife, and that, as such mortgagee, he sold them to the highest bidder at public out-cry ; that some days before the sale, and before the contract sued on was made, the defendant told the plaintiff the slaves were family servants, and that he wanted to buy them, but had not the money ; and that the plaintiff replied to the defendant, that if he, the defendant, should bid off the slaves at the sale, that he, plaintiff, would take defendant's note, "with the same stipulations and conditions as shown by the note and other papers executed between the parties at the time the note was made ;" that to this "the defendant assented, and authorized the plaintiff to bid off the said slaves for him with that understanding."

Our construction of the bill of exceptions is, that the price which defendant was to pay for the slaves, was not to be determined by the bidding at the mortgage sale ; but that it, together with all the other terms and conditions of the contract, were agreed upon before hand, and was to be consummated, without regard to what the slaves might bring at the sale, provided the plaintiff should bid them off for the defendant. We think there can be no doubt but that this is the proper construction of the bill of exceptions ; but if we had doubt, we should solve it against the defendant, under the well-established rule that the bill of exceptions being considered as his document, it is to be construed most strongly against him.

We can not perceive, then, that any material fact, tending in the least to show fraud, or a want of good faith on the part of the plaintiff, was excluded from the consideration of the jury, by the charge in question. The credibility of the testimony was left by the charge entirely with the jury ; and where the facts are clear and undisputed, the question

of fraud, or not, is a pure question of law.—*Swift v. Fitz-hugh,* 9 Porter, 39.

*Fifth,* the question as to the illegality of the contract because a portion of the purchase-money was to be paid' in Confederate money, is fully discussed, and decided adversely to appellant, in *Scheible v. Bacho,* at the present term.

After a careful consideration of all the questions presented by the counsel of appellant, our conclusion is, that there is no error in the record, and that the judgment must be affirmed.