# Dudley v. Abner.

### Trover for Conversion of a Mare.

1. *Conditional sale; what is, and how affects bonâ fide purchaser.* — Where the owner delivers a mare to another to keep and work her, with the understanding " that the mare is to belong to the owner until the price is paid, when the owner is to give a receipt or bill of sale," the transaction constitutes a conditional sale, void as against *bonâ fide* purchasers without reference to the registration laws. (Manning, J., held the transaction should be viewed in the light of a parol chattel mortgage, and that it was void as to bonâ fide purchasers and creditors of the vendee under the influence of sections 1561-2 of the Revised Code.)

2. *Trover; what acts of plaintiff do not estop him from bringing.* — Where the plaintiff, an illiterate negro, acting upon the advice of the defendant and another person of influence and standing, delivered up property to defendant, who claimed to hold a mortgage on it, this does not estop him from bringing trover against the defendant for the conversion, if it turns out that the property is not subject to the claim asserted.

3. *Bonâ fide purchaser; what constitutes.* — A bonâ fide purchaser, in respect to a person who has an undisclosed lien or claim upon the property, is one who buys it for a valuable consideration without notice of such claim or lien; and he is a purchaser for a valuable consideration notwithstanding he may have taken advantage of, or cheated, his immediate vendor by misrepresenting the value of the thing with which the purchase was made. This fraud, if there was no collusion between these two against the person holding the claim or lien, cannot be set up by the latter.

Appeal from Circuit Court of Lowndes.

Tried before Hon. James Q. Smith.

Abner brought trover against Dudley for the conversion of a mare.

In the years 1870 and 1871 Dudley was cultivating a plantation, and among his tenants had one Abram Webb. Dud-

[Dudley v. Abner.]

ley, then owner of the mare in controversy, delivered her to Webb, "with the contract and understanding that Webb was to work the mare in his crops, but she was to be Dudley's until paid for, and when paid for she was to belong to Webb, to whom Dudley was then to give a receipt or bill of sale for the mare." The price to be paid is not stated in the bill of exceptions. In 1871 Abner, the appellee, exchanged his mule with Abram Webb for the mare and took her home. At that time Webb owed fifty dollars on the price, after allowing him all credits, but he did not then know that the mare was not fully paid for. In the following June, Dudley learned of the exchange. He and another white man, one Harrel, took the mule to Abner, a negro, and Dudley informed him that the mare had not been paid for, and that he had a lien or mortgage on her and had come to demand her. Abner was reluctant to part with the mare, but on being told by Harrel that if Dudley had the mortgage or lien it was his duty to give her up, he put a bridle on the mare and delivered her to Dudley, who rode her off.

Dudley left in place of the mare the mule which had been exchanged for her, and was then broken down, both being in bad order, and also a colt she had while in Abner's possession, saying to Abner "that the mare was enough to make him [Dudley] whole." At the time of the trial, Webb, to whom Dudley delivered the mare when he got her from Abner, was using her, and the mule was dead.

The defendant offered testimony to show that while Abner was trading with Webb and making the swap, "he represented the mule as a good work mule, and further said that the mule had broken up all of plaintiff's land. He further offered to prove by Harrell and Webb that the mule was not a good work animal; that it would not work, and was the worst work mule the witnesses had ever seen." The court refused these offers, and defendant excepted.

The defendant requested three written charges, each of which the court refused, and to each of which refusals the defendant excepted. The first of these charges directed the jury that if they believed that the mare was sold to Webb under the circumstances above shown, "and if when the exchange was made $50 was due on her, and that within a reasonable time afterwards Dudley obtained the mare peaceably and without any breach of the peace, the plaintiff could not recover." The second charge was the same as the first, except that it directed the jury not to find for the plaintiff unless the evidence convinced them that he acquired the mare in fair trade and in good faith." The third charge asserted in substance that if Dudley regained possession of the mare in the manner above

[Dudley v. Abner.]

set forth, without any breach of the peace, he was not guilty of a conversion.

The exclusion of the evidence offered, and the refusals to give the charges requested, are now assigned as error.

STONE & CLOPTON, for appellant. — Dudley's right to recover of Webb cannot be disputed. Abner obtained all his rights from Webb, and must fail if he is not an innocent purchaser for value, &c. The testimony excluded showed fraud, overreaching, in the very transaction by which Abner claims title. It negatived the *bona fides* of the purchase. A contract tainted with fraud of any species, or any violation of a statute, cannot ripen into a *bonâ fide* purchase. *Saltmarsh* v. *Tuthill*, 13 Ala. 390 ; 16 Wendell, 575.

In *Sumner* v. *Woods*, last term, it was held that the purchaser under such circumstances must *show* that he was *bonâ fide* purchaser. That burden is not on the former owner. If that case is adhered to, the refusal to give the second charge was error. The maxim " *Volenti non fit injuria* " clearly applies and justifies the third charge requested. The present case, however, is not the case of a *mortgage* or the like. It comes within the principles of a loan of property. § 1564 Rev. Code. Dudley's title was in no peril until three years elapsed. 21 Ala. 119.

CLEMENTS & ENOCHS, *contra*. — The proffered evidence to show that Abner cheated Webb was properly excluded in this suit, however proper it might have been in an action between Webb and Abner. *Smith, Wykoff & Nichols* v. *Jones*, 29 Ala. 283. Dudley's possession was *tortious*. The court will look to all the circumstances attending the taking by Dudley. 48 Ala. 75. The plaintiff never *consented* to the taking.

MANNING, J. — The appellant in this cause bought the mare in controversy, in the early part of the year 1870, and delivered her to Abram Webb, a colored man (tenant of premises which Dudley had leased to him), upon an agreement that Abram should keep and work the mare, and pay a certain price for her ; upon payment of which price Dudley was to give to Abram a receipt or bill of sale of the mare, but retain the title to her until that time in himself. How much Abram was to pay for the mare does not appear. But Dudley, who testifies (as another witness also does) that the mare was in a low condition when he took her from Abner, the appellee, says further, she was then worth $100 ; while Abner testifies she was then worth $150. We must infer, therefore, that the price of her, between Dudley and Abram, was fixed at a sum exceeding $100.

[Dudley v. Abner.]

Dudley further testifies that the proceeds retained or received by him, of Abram's crop of 1870, paid all the rent Abram owed him for land, and the money due for advances, and the price of the mare, except fifty dollars. No account is stated showing this result; nor was Abram made aware until June, 1871, that the mare was not fully paid for. In March of that year Abram traded her to appellee, Abner ; who in this cause sued Dudley in trover for the mare, he having got possession of her, and obtained a judgment below for damages.

The question is, should this judgment be reversed ?

Was there or not a sale of the mare from Dudley to Abram ? Suppose that, without any fault of the latter, the mare had died instead of being exchanged to Abner for a mule: would Dudley have been liable to Abner for so much of the price as Abner had paid to him ? If not, it would seem to be because the mare belonged to Abram. If the mare had died as supposed, would not Abram have been bound to pay the balance of the price to Dudley ? If yea, it would again appear to be because the property in her, a qualified property at least, had passed to Abram. True, Dudley still had an interest in the mare, — perhaps retained the legal title. But what was the nature of the contract between them ?

A transaction similar to that between Dudley and Abram Webb, was brought before this court in *Weaver* v. *Lapsley*, 42 Ala. 601. On the 1st of February, 1865, just before the close of the late war, Lapsley sold two slaves, of which he had a mortgage with power of sale, to Weaver, and took Weaver's note for them for $2,030⁰⁰ payable at a future day, and delivered the slaves and a writing to Weaver, which writing contained these words : " In accordance with the agreement now hereby made with the said L. G. Weaver, proper titles for said negro girls, under said mortgage and sale, will be made, and I bind myself to make the same to Mrs. Margaret Le Grand Weaver, wife of said Le Roy G. Weaver, on the payment of said note; until which payment the title to remain in me."

The war having ended, and the negro girls being set free, before the note was paid, Weaver insisted that the sale was not complete, that it was conditional, and that he was discharged from payment of the note, because, upon its being paid, Lapsley could not give " proper titles " to the slaves. The case was argued by counsel of great ability more than once. And the court said : " The contract between the parties was not a stipulation *to sell at a future day*, but was an absolute sale accompanied by a delivery of the property, — with a stipulation that the purchase-money should be paid at a future day, and that on its payment the vendor should make ' proper

[Dudley *v.* Abner.]

titles ' to the wife of the vendee. We cannot hold such a contract to be *conditional* sale. If the retention of the title by the plaintiff had any effect, it was simply to give him a security for the payment of the purchase-money, in the nature of a mortgage. . . . . There is a striking analogy between a contract like the one we are considering, and a contract for the sale of realty, where the vendor executes his bond conditioned to make titles on the payment of the purchase-money. In the latter case, a court of equity considers the contract as being a conveyance to the purchaser, and a reconveyance back by way of mortgage to secure the payment of the purchase-money." And as a conveyance of personal property can be made without writing, this court held that a court of law must put the same interpretation upon the transaction it had under consideration.

The only difference between this case and the one now in hand, in the view we are taking of them, is, that in the former the contract was in writing, and in the present one it is not. But this difference does not affect the validity or construction of the contract. No right of a third person, however, came up for consideration in *Weaver* v. *Lapsley.*

The case of *Wait* v. *Green* (36 N. Y. Rep. 556), decided in 1867, was this : Catherine Comins sold and delivered a horse to one Billington, and took his note for $100, at five months, for the price ; and under the note and on the same piece of paper was this memorandum, signed by Billington : " Given for one bay horse. The said Mrs. Comins holds the said horse as her property until the above note is paid." Billington afterwards sold the horse for value to a purchaser without notice, against whom, after demand, a suit was brought for the recovery of the horse.

The court of appeals of New York were unanimous in opinion, and said : " Let it be conceded that the sale and delivery was conditional, that the agreement was that the horse should remain the property of Mrs. Comins until paid for, and that the plaintiff succeeded to all her rights, and that the defendant was a *bonâ fide* purchaser from Billington ; and the authorities are full to the effect that the defendant will be protected in his title. When chattels are thus sold and delivered conditionally, the vendor's right to the property remains good as against the vendee and his voluntary assignee, and others who purchase with knowledge of the condition, but not as against *bonâ fide* purchasers from the vendee."

About two years after this another similar case came before the same court of appeals of New York, and (two judges dissenting) was decided differently. This was *Ballard et al.* v. *Burgett*, 40 N. Y. R. 314.

[Dudley v. Abner.]

Plaintiffs in October, 1865, sold a yoke of oxen to one France for $180, and put them into his possession under an agreement that the oxen were to remain the property of the plaintiffs until paid for. Without having paid for them, France, in April, 1866, sold and delivered the oxen to defendant, who purchased without any notice of plaintiff's claim. The court, two judges dissenting, decided that plaintiffs were entitled to recover. GROVER, J., in delivering the opinion of the court, referred to the case of *Wait* v. *Green, supra,* and after stating the facts of it, as we have above stated them, says : " The fair intendment from the above facts is, I think, that Mrs. Comins intended to sell and deliver the horse to Billington, and transfer the title to him, and take back from him security for the payment of the note, in the nature of a chattel mortgage, upon the horse. It is clear that had the horse died without the fault of Billington before the payment of the note, such death would have been no defence to the action on the note. The horse was at the risk of Billington. This is a *strong if not conclusive* circumstance, showing the correctness of the above construction of the facts. Not so in the case at bar. Had the oxen died without the fault of France, no action could have been sustained by the plaintiffs for the purchase-money. That, in no event, could be recovered, unless the plaintiffs were able to give France a title to the oxen, — unless their ability so to do had been prevented by France."

The decision in this case of *Ballard* v. *Burgett,* predicated on this reasoning, is an authority in favor of Abner in the cause now in hand; for we suppose no one will doubt that if the mare sold by Dudley to Abram Webb had died before Abram traded her to Abner, without the fault of Abram, Dudley would have insisted that the loss must fall upon Abram. And according to the reasoning of Judge GROVER, the transaction between Dudley and Abram was a sale, with the reservation of a lien in the nature of a parol chattel mortgage.

A similar view of the rights of the parties upon the termination of a conditional contract of sale seems to have been taken by the supreme court of Michigan (CHRISTIANCY, J., delivering the opinion) in *Preston* v. *Whitney* (23 Mich. 267), in which it was held that the conditional purchaser who had paid several instalments of the price, and then failed to pay subsequent ones, was, on the termination of the contract and taking back by the defendant of the article sold, entitled to recover the instalments previously paid.

Upon the same idea, that if the property which is the subject of a conditional sale be destroyed or perish without fault of the party having possession of it, the loss must fall upon him who has the title, the defence was predicated in the important

case of *Weaver* v. *Lapsley, supra;* and this idea, not controverted as unsound in law, was obviated by the court's showing that the contract under consideration was not that of a conditional sale. It is not intended, however, to insist that the proposition involving that idea is good in all cases of conditional sales. But it must be obvious that troublesome questions may arise in such cases, especially if one of the features of them should be that the conditional seller has taken back the property for non-payment of the price in whole or in part, or the property so sold shall perish or be destroyed before being paid for, without the fault of the conditional purchaser.

If we hold that there has been a sale, and the title to the article remains in the seller merely for his security as title is vested in a mortgagee, there is no difficulty in determining what the rights of the parties are. But if we hold that it is a conditional sale, that no property in the thing is passed to the person in possession of it, that there is no change in the title, but the thing continues to be his who had the title to it, and is to remain his until the performance of some condition upon which a change of property is to take place; then if the thing perishes or is destroyed before the performance of that condition without the fault of the party in possession, the logical result would seem to be that he must bear the loss to whom the thing belonged. To avoid that result, a contract must be implied on the part of the person in possession, in the nature of a contract of insurance, that the thing shall not be destroyed before performance of the condition.

If, again, it is a case of conditional sale, and the owner of the article, for failure to pay the price, take it away from the conditional vendee, what is to be done with it? Does the contract become void, and has he a right to dispose of the article as he chooses? If so, it would seem that his only claim against the conditional vendee would be for hire for his use of the article; *Preston* v. *Whitney, supra;* or perhaps an action on the case for damages.

But what if this vendee has made partial payments of a large part of the purchase-money; shall the vendor pay these back or sell the article to pay the residue? or shall he keep it or sell the entire property in it as his own? If he must sell it to pay the balance of the price, upon what notice shall he do so; by what rules of law are his duties and obligations prescribed, and the rights of the vendee protected? If we consider the parties as bearing towards each other the relation of mortgagor and mortgagee, there is no difficulty in the solution of these questions. But if it be a case of " conditional sale," or " conditional contract of sale," they may prove to be embarrassing and require legislative action.

[Dudley *v.* Abner.]

Whatever name, however, we give to the transaction, according to the decision of this court in *Sumner* v. *Wood* (at the January term, 1875), " such a contract cannot be set up to the prejudice of *bonâ fide* purchasers and creditors without notice."

Reference was made in that case to *Martin* v. *Mathiot* (14 Serg. & R. 214), in which a sheriff had levied an execution against one Michael, on horses and harness in his possession, but which was claimed by Martin, who brought suit for them against the sheriff. The decision of the court below was that " if vendor and vendee agree that the possession shall pass to the vendee, but the property remain in the vendor until the whole purchase-money is paid, such agreement, as respects creditors and the sheriff, is fraudulent," and this was brought up to the supreme court of Pennsylvania for revision.

TILGHMAN, C. J., said : " I cannot say that I see any error in the opinion of the court of common pleas. Possession of personal property is the great mark of ownership. It is almost the only index which the world in general has to look to. But there are exceptions. There are certain necessary and lawful contracts by which the owner parts with the possession, and yet fraud cannot be presumed. Such are the contracts of lending and hiring, both very useful, and without which society could not well exist. It is of the essence of these that the owner should give up the possession for a time. Such, too, are contracts by which an artisan or manufacturer has the possession of materials belonging to another for the purpose of making them up, or repairing them for the owner. No suspicion of fraud can fairly arise when the transaction is in the usual course of business. But the case is very different where it is intended that the property should be apparently in one, while it is in fact in another. This is out of the usual course of business, unnecessary, and directly tending to the injury of those who are not in the secret. In the present instance, for example, there was a sale of four horses and harness, and possession delivered to a man who got his living by the use of his team. All the world had a right to suppose that he was the owner of the horses which he drove ; and a secret agreement to the contrary was an injury to society, by giving the wagoner a false credit, which might induce others to trust him with their property."

There are other cases besides those mentioned by C. J. TILGHMAN, in which title is allowed to be in one person and possession in another. These are cases of contracts that one person shall become the owner of an article upon condition that he pay or secure payment of the price of it to another, or upon some other like condition in contemplation or expecta-

tion of the performance of which the article is sent to or taken by the intended purchaser, perhaps for examination, — at least without any intention that it shall become or be used as his, until he shall have performed the condition. Such contracts frequently arise and are very convenient in commercial dealings ; and within proper limits they are freely allowed. What these limits are it is not easy to define ; and hence it is not very surprising that in the numerous cases of supposed or real conditional sales, or conditional contracts of sale, some are found which are not reconcilable with one another, or with the rights of third persons in the articles which are the subjects of them.

Without reviewing the cases further, it seems to me it would be best, and would tend to the avoidance of embarrassing questions, to hold that when the owner of personal property delivers it to another to be used by the latter in his trade or business as his own, upon an agreement that at a future day he shall pay for it a stipulated price, and that until the payment is made the title to the property shall remain in the person who so delivers it, — and the nature of the transaction is such that if the article perish or be destroyed without the fault of the person who has possession and the use of it, yet he shall be liable for the agreed price to the other party, — this is not in strictness a conditional sale or contract to sell, but a sale for a price payable at a future day, with a reservation of the title for security, in the nature of a parol chattel mortgage, and such it seems to me was the transaction between the appellant in this cause and Abram Webb.

This case is not within the scope of sections 1564 or 1565 of the Revised Code. They embrace cases in which the chattel involved is the property of a third person, and in the possession of one not the owner upon a loan or hiring of it to him, or *temporarily* for some other reason, and in which the owner intends to resume the possession. And of these cases it may be said that such is the actual course of human transactions, and the disclosures naturally and undesignedly made respecting them, that if a person has property that is merely lent or hired to him, or that really belongs to another who intends to resume possession of it, it rarely happens that the fact does not become known to those who may be concerned to know it. And he, besides, would not be apt, by disposing of it as his own, to subject himself to the penalties of the criminal law. But the same publicity does not obtain of the existence of an unrecorded lien or property in possession of the owner or of a purchaser.

Most of the decisions declaring such contracts as that we are considering void, as against *bonâ fide* purchasers and creditors of the vendees, hold that they are so independently of any

statute of registration, upon the imputed fraud in the tendency of such transactions to give false credit to persons in possession and to lure others into trusting them thereupon. This policy of the common law is fortified and enforced by sections 1561 and 1562 of the Revised Code; and these are to be liberally construed in support of the policy.

Prior to these provisions in the Code, there was a statute of 1828 which enacted that "All deeds and conveyances of personal property *in trust* to secure any debt or debts shall be recorded," &c., &c., " or the same shall be void against creditors and subsequent purchasers without notice." In *McGregor* v. *Hall* (3 Stew. & Port. 397), it was contended for a mortgagee, that this did not embrace mortgages; that these were different from deeds, or conveyances *in trust*. The court answered: " Mortgages are included within the meaning and intention of the legislature. The object of the act is to give notice to the world of the liens which are held on property, by persons out of possession, so as to prevent credit from being given to holders, on account of the possession of it. . . . . It behooved the legislature to throw every guard around the honest members of the community that was possible, to protect them from the arts and combinations of the fraudulent. The act of 1828 was therefore passed. . . . . Every reason which could have influenced the general assembly to provide that deeds of trust to secure debts should be registered, operates in an equal or greater degree in respect to mortgages."

Thus, as long ago as 1832, this court held that the statute established a salutary policy which should be upheld by a liberal interpretation of the laws on the subject. In 1863, with like views in respect to the provisions in the Code, it was held that they reached a mortgage made out of the State, by persons residing out of it, of personal property within the State. *Hardaway* v. *Semmes* (38 Ala. 657) ; and in *Brooks* v. *Ruff* (37 Ala. 371), speaking of parol unwritten mortgages of personal property, WALKER, C. J., said: " Such a mortgage would, by virtue of our registration statute, be void ' as to purchasers for a valuable consideration, mortgagees, and judgment creditors without notice ' (Code, § 1288) ; but we think it would be valid as to parties and others not protected by the statute."

The case before us, although not within the terms of the sections of the Code above quoted, comes within the influence of the policy which they establish, for the protection of *bonâ fide* purchasers and creditors without notice : and Abner, as a *bonâ fide* purchaser, got a good title against Dudley. My colleagues hold that his transaction with Abram Webb was a conditional sale, and void as against Abner, a *bonâ fide* purchaser, without reference to registration laws.

[Dudley *v.* Abner.]

Considering the circumstances and the representations made by appellant and Mr. Harrell, both white men of considerable property and standing, under which the appellee, Abner, reluctantly allowed appellant to leave the mule, that was returned broken down, and take away the mare, the court below correctly ruled that this did not constitute a good defence. The maxim, *Volenti non fit injuria*, does not apply in such a case.

Appellant offered to prove that Abner falsely represented to Abram Webb that the mule was a first-rate work mule, and had broken up the land for his crop, and to prove further to the contrary, that the mule was one of the worst work mules known, whereby he had cheated and defrauded Abram of the mare, and was not a *bonâ fide* purchaser.

A *bonâ fide* purchaser in respect to a person who claims an undisclosed lien or property in an article subsequently sold, is one who, in the more accurate expression of our statute law, is a "purchaser for a valuable consideration without notice." Rev. Code, §§ 1558, 1559, 1561, 1562, 1563, 1566. And he is a purchaser for a valuable consideration who parts with something of value for the thing purchased. Whether in the transaction between him and his immediate vendor he gets the advantage of, or cheats the latter, by misrepresenting the qualities or value of the article he gives in exchange for the thing purchased, is a question which, if there be no collusion between those two against the person having such secret lien or property in it, the latter cannot raise. Hence, whether the mule was or not all Abner represented him to Abram to be, was a matter irrelevant in this controversy.

If Abram found that he had been overreached or defrauded, and intended to insist on a rescission, it was his duty to do so promptly, while the parties could be put in *statu quo*. If he did not choose to wage this contest, Dudley cannot do so in his stead.

The cases to which appellant's counsel refers us on this point are those in which contracts condemned were made by both parties in violation of laws that prohibited them from being made at all.

It is because of the great number and real importance of cases of the class to which the one before us belongs, that it has been considered at so much length.

The judgment is affirmed.