Staples, J.
delivered the opinion of the court.
This case has been twice ably and elaborately argued before this court. As the first argument was before three judges only, a ré-argument before a full court was requested. That argument was heard at the last term held in Wytheville—all the judges being present. It becomes my duty now to announce their unanimous decision, and thereasons upon which that decisionis based.
The controlling question in the case is as to the effect of the proclamation issued by President Lincoln on the first day of January 1868, and known as the emancipation proclamation. On the one hand, it is maintained, that this proclamation from the time of its emanation, in connection with the various acts of Congress authorizing and confirming it, conferred a right to freedom upon all slaves within the States therein designated. On the other, it is insisted, that it was limited in its practical effect, to such slaves individually as came under its operation while it was in active exercise as a war measure. In order to discuss properly these questions, it becomes necessary to recur briefly to a few familiar principles. It has never been maintained by any respectable authority, that the Federal government was authorized *469 under the constitution, in any manner to interfere with the institution of slavery in the several States. The right of property of the master in a slave was recognized not only in the constitution, but by every department of the government, from its foundation down to the commencement of the war between the States. If any proposition could be regarded as settled beyond all cavil and controversy, it was that this institution was entitled to the benefit of all the provisions and guarantees provided for the protection of any other property. See Prigg v. Commonwealth of Pennsylvania, 16 Peters, U. S. R. 539. But a very brief period before the commencement of hostilities the Congress of the United States, by a resolution unanimously adopted, declared that neither the Federal government, nor the people, nor the governments of the non-slaveholding States, have the right to legislate upon, or interfere with, slavery in any of the slaveholding States of the Union.
It cannot be necessary by argument to maintain that a power denied to all the departments of the Federal government combined, cannot be exercised by the executive .alone. His powers are plainly defined in the constitution and the acts of Congress, and to these we must look to ascertain the measure of his authority. In neither can any warraut be found for the extraordinary powers assumed in the proclamation. If any act or resolution was ever passed by the Federal Congress, authorizing that proclamation or sanctioning it after it was issued, I have been unable to find it. The learned counsel for the appellant insisted there was some such legislation, but he did not produce it, nor tell us where it was to be found. I think it very clear that no such laws were ever enacted by Congress.
It was argued, however, that the President was empowered to issue the proclamation in virtue of his authority as commander-in-chief of the army and navy of the United States. According to Mr. Hamilton, the *470 authority of the president under this clause of the constitution, is nominally the same with that of the king of Great Biitain, hut in substance it is much inferior to it. It amounts to nothing more than the supreme command anc^ direction of the military and naval forces as first general and admiral of the Confedei’acy. The doctrine now advanced, however, engrafts upon the executive department new, undefined, ideal powers not enumerated in the constitution, and contrary to the genius of republican government. It assumes that a state of war utterly abrogates every guarantee provided for the security of property, at the discretion of an irresponsible executive. "When combinations are formed to resist the execution of the laws, too powerful to be suppressed by the ordinary course of judicial proceedings, the president is authorized to call forth the whole military and naval power of the country. In such case the war is still against individuals, and not against communities and States. Confiscation and forfeiture may follow trial and conviction of the citizen. But it cannot be denounced against entire communities and States—the innocent equally with the guilty—without trial and conviction.
The Supreme court of the United States, in a late case, in unmistakeable terms repudiates the idea, that any department of the government, in war any more than in peace, can exercise powers not expressly granted by the constitution. In ex parte Milligan, 4 Wall. U. S. 121, the court uses this strong and patriotic language : “ The constitution is a law for rulers and people in war and peace, and covers with the shield of its .protection, all classes of men, at all times, and under all circumstances. Ho doctrine involving moi’e pernicious consequences was ever invented by the art of man, than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism. The theory of necessity, on which it is based, is false; for the government within the *471 constitution has all the powers granted to it, which are necessary to presei’ve its existence.”
The supporters of the president’s proclamation, however, invoke another principle in its support, which has an important bearing in this case. They maintain, what is undoubtedly true, that the parties to a civil war stand precisely in the same predicament as two independent nations, who, acknowleding no superior, have recourse to arms ; and that the late struggle between the two sections being of that character, it was competent for the Federal authorities to exercise belligerent powers, and-to treat the people of the Southern States as public enemies engaged in a national war; and consequently, that all persons of every age, sex and condition, residing within the territory occupied by the Confederate forces, might be justly considered, and were, in fact-, considered as public enemies, and subject to all the laws of war ; one of these is, that the Federal government had the right not only to coerce the Southern section by force, but to cripple its rescources by the seizure and confiscation of every species of property which might have been made useful in the struggle. And in the case of slaves, they might be justly emancipated as a means of weakening the enemy and terminating the struggle.
In the first place, it is by no means certain that this principle of belligerent occupation applies to the emancipation of slaves. There is very high authority for a contrary doctrine. At the close of the Revolutionary war a claim of indemnity for slaves taken away by the British forces, was instituted by the United States in behalf of the owners, and was successfully maintained. And in the negotiations after the close of the war of 1812, Mr. Adams, then secretary of State, took the ground that emancipation of slaves was not a legitimate mode of warfare, and the British government ought to restore the property or to indemnify the sufferers by its loss. American State Papers, vol. 11, p. 245.
*472 Conceding, however, this right of emancipation, and giv’1Dg t° the proclamation all the effect of a war measure between independent nations, it is clear it could not operate in regions beyond the control of the Federal authorities. It is laid down by all the writers on international law, that the right of appropriating or confiscating the property of the enemy depends upon belligerent occupation. The proclamations and manifestoes of one power can never have any effect within the dominions or possessions of the other not embraced by the lines of conquest and occupation. The authority of the invader extends no further than his possession. His title rests upon force, and is measured by it. This is an universal principle acknowledged by all.
As a war measure then, the proclamation of President Lincoln could only have the effect of emancipating such slaves as came within the control of the Federal armies. The authorities upon this point are abundant. In his notes to Wheaton, Mr. Dana uses the following language : “It will be observed, that this order of emancipation was not a legislative act of the law-making power of the Union; but an act of the president, in his character as commander-in-chief, and a military measure. Although the language of the proclamation is general, and in the present tense, as if giving, a legal status of freedom from its date to all slaves in the designated States ; still from the nature of the case, it would seem that, being a military measure by a commander-in-chief, who had no general legislative authority over regions of country not in his possession, it could not operate further than as a military order. From that time allslaves coming under the control of the forces of the United States, in the manner recognized by the law of belligerent occupation, were to be free.
And in the case of Cornett v. Williams, in the Circuit court of the United States for the State of Texas, Judge Duval held substantially the same views. He said: “I *473 have always regarded the proclamation of the president, issued on the 1st of January 1863, declaring the negroes free, as a war measure. The president did not base his right to issue that proclamation upon any clause of the constitution, or even any act of Congress. It was justified by the necessities of war ; and as commander-in-chief of the army and navy of the United States, he resorted to it, as he himself declared, as a war measure. Its operation and efi’ect depended wholly upon the success of the national arms. The negroes were set free not by the mere declaration of the president that they were so, but by force of arms. Hence I have always supposed that slaves who occupied certain sections of the country, say in Virginia and Tennessee, and who first fell under the armed control of the Union, were free sooner than those in Texas or the extreme south.” These views are supported by numerous cases. United States v. Rhodes, 7th Circuit for the State of Kentucky; Slabach v. Cushman, 12 Florida R. 472 ; Leslie v. Langhorn’s ex'or, 40 Ala. R. 524 ; Harrell v. Watson, 63 North Car. R. 454 ; Dorris v. Grace, 24 Ark. R. 326 ; Hall v. Keese, 31 Texas R. 504; Pickett v. Wilkins, 13 Rich. S. C. Eq. R. 366; Haslett v. Harris, 36 Georgia R. 632.
We have the most satisfactory evidence that Mr. Lincoln himself entertained the same opinion in regard to the effect of his proclamation. In a message to the Federal Congress, he said : “I repeat the declaration made a year ago, that while I remain in my present position, I shall not attempt to retract or modify the emancipation proclamation ; nor shall I return to slavery any person who is free by the terms of the proclamation or any act of Congress.” And in the Hampton Roads Conference, being asked by Mr. Stephens what effect that proclamation would have upon the institution of slavery in the States therein designated, he said that was a judicial question. His own opinion, however, was that as the *474 proclamation was a war measure, it would be held to apply only to such slaves as had come under its operation while it was in active exercise.
.Upon the whole, I think we may safely conclude, both upon reason and authority, that as the negroes sold under the decree in this case were, at the time of said sale, occupying a territory exclusively under the control and within the lines of the Confederate government, the rights of the owners were in no manner impaired or affected by the proclamation. They were slaves, to every intent and purpose, at the time of their purchase by the appellant’s iutestate—so treated and recognized by the laws and authorities of the country. They were the property of appellant’s intestate at the time of their emancipation, and the loss resulting therefrom must fall on him. This pi’inciple was distinctly affirmed in Mittelholzer v. Fullarton, 6 A dol. & Ellis N. S. 989, 51 Eng. C. L. R. That was an action for the recovery of the price stipulated to be paid for fifty-three apprenticed laborers. The defence was that the laborers had been set free by act of the Colonial government in British Guiana, where the apprentices were. The court held the plaintiff entitled to recover, though the apprenticeship was determined by the Legislature before the purchase money became due. And this upon the ground that the property having passed, and being destroyed by a vis major, the loss must fall upon the proprietor when it occurred.
Another ground taken by appellants is, that contracts for the sale of slaves made since 1st of January 1863-, are void upon reasons of public policy. I do not understand it is claimed that such contracts are founded in moral turpitude, but that they are opposed to the national policy and institutions, and for that reason should not be enforced. It iá a general rule that the validity of a contract is to be determined by the law of the place where it is made. If valid there, it is by the law of *475 nations held valid everywhere. The exceptions to this rule are found in those cases in which the contract is immoral or injurious to the State or its citizens. Contracts, however, for the sale of slaves, entered into in States which allow slavery, are enforced in countries which regard slavery as contrary to the principles of justice, humanity and natural right. This rule is founded upon the idea that as slavery is not in violation of the genei’al laws of nations, if any State thinks proper to establish and continue its existence by its own laws, every State will take notice of and give effect to contracts sanctioned by such laws. There are numerous decisions in support of this principle. Thus in Madrazo v. Willes, 3 Barn. & Ald. R. 353, 5 Eng. C. L. R. 313, it was held, that a foreigner who is not prohibited by the laws of his own country from carrying on the slave trade, may, in a British court of justice, recover damages sustained by him by reason of the wrongful seizure by a British subject, of a cargo of slaves on, board of a ship employed by such foreigner in carrying on the African slave trade. It w'as so held, although British statutes at the time denounced the traffic as inhuman and unchristian, and inflicted the severest penalties upon British" subjects engaged in it. Best, J., with whom the other judges concurred, said: “It was impossible to say the slave trade was contrary to the law of nations. Most of the States of Christendom had consented to its abolition; but Spain had reserved to herself a right of carrying it on in that part of the world where this transaction occurred. Her subjects could not be legally interrupted in buying slaves in that part of the globe, and have a right to appeal to the justice of this country for any injury sustained by them from such an interruption.” And in the Commonwealth v. Aves, 18 Pick. R. 193, Chief Justice Shaw declares, that in pursuance of a well known maxim, that in the construction of contracts the lex loci contractus shall govern, if a note of hand made in *476 New Orleans were sued on in Massachusetts, and the defence should be that it was a bad consideration, or with011! consideration, because given for the price of a slave sold, it may well be admitted that such a defence could not prevail, because the contract was a legal one by the law of the place where it was made.
These principles apply with peculiar force to contracts for the sale of slaves entered into at a period when the institution was recognized and protected by the fundamental laws, and sanctioned by the public sentiment of the State. It would be monstrous to hold that a contract, perfectly fair and legal when made, can become illegal, or be held contrary to public policy, by reason of a subsequent alteration of the laws and constitution of the State. At the time of the purchase in this case slavery was still an established institution of Virginia, recognized and sustained both by the Richmond and Wheeling government. Nor was its existence contrary to the public policy of the United States government. It still prevailed in the States claiming to be loyal to that government. Congress had not attempted to interfere with it anywhere. Its legislation related only to such slaves individually as came under federal control. It is true that the proclamation asserted the emancipation of all the slaves within the. designated States. In this respect, as has been seen, it was utterly without authority. The powers therein assumed were not conferred, nor were they confirmed by the legislative department. The proclamation was issued not because slavery was believed, or even asserted, to be unjust or opposed to public policy, but avowedly as a war measure—a military necessity essential to the success of the federal arms. In regions of country under Confederate control it had no more effect than a manifesto confiscating all the real and personal property in the Southern States. In all these regions slaves were treated as property by the laws, by the government, and by the people. They *477 were administered by executors; they were sold under executions and decrees of courts; they passed by bequest and distribution; they were the subject of purchase and sale amid all classes of society, in every form of investment, traffic and speculation. It would not be extravagant to say, that during the four years’ war alone the investments in slaves amounted to millions. "We are now told that public policy requires the courts to annul any and every contract entered into during this period, based upon the sale of property thus recognized and sanctioned for generations by the sentiments, the laws and the tastes of the people of .Virginia. The proposition involves, in my judgment, an admission derogatory to our whole previous history. Notwithstanding the institution was recognized as lawful and constitutional by both State and Federal government, was sustained bv public sentiment, was interwoven with the entire framework of society, and was believed by men eminent for wisdom and piety to be in accordance with the principles of religion, humanity and justice; notwithstanding all this, because it has been destroyed by paramount force, we are expected not only to give it up without a murmur, but to surrender all our previous convictions, to yield our faith and consciences to the keeping of others, and henceforth to believe that slavery was wrong in itself—a curse upon our country—a moral leprosy which corrupted the life-blood of the nation. The proposition now advanced means this, or it amounts to nothing. If slavery was lawful—if it was not opposed to good morals and national honor—it is idle to say that the destruction of the institution can impair or affect contracts made during the period of its'legal and constitutional existence.
It is worthy of notice, that in nearly all the States in which this question has been raised, the validity of this class of contracts has been fully sustained. Georgia, Arkansas and Louisiana are exceptions. But in these *478 States the decisions were based avowedly upon the pro-' visions in their State constitutions prohibiting the courts from rendering judgment of recovery in such cases. The SupTeme court of the United States reversed the decisions rendered by the G eorgia and Arkansas courts, upon the ground that these provisions impaired the obligation of contracts. I understand three of the judges dissented upon the ground the contracts were void upon reasons of public policy. A large majority of the court sustained the validity of the obligations given for the purchase money, though the reasoning of the court on this branch of the subject is not given. It was argued, however, that as the purchaser was deprived of his slaves by the act of the State, so by the act of the State he should be relieved of the obligation to pay for them. The gross injustice of the government, in requiring the citizen to pay for property wrested from him by the sovereign power, has been strongly pressed upon our consideration. In the first place, the emancipation of slaves in Virginia was not the act of the State, nor in any manner effected by its agency. It did not depend upon, nor was it the result of, the ratification of the Thirteenth Amendment by the State. The effect of' that amendment was merely to prohibit the institution for the future in Virginia. The slaves in the State were as absolutely free at the close of the war without as with that amendment. They were emancipated by force of arms by the conquest and subjugation of the South. All men knew the fact, and all acquiesced in the result. The State is, therefore, not in the predicament of compelling her citizens to pay for property of which she has deprived them.
But the argument upon this point is founded upon some confusion of ideas in respect to the functions of the judicial aud legislative departments. The constitution declares that the citizen shall not be deprived of his property without due process of law; nor shall private *479 property be taken for public use without just compensation. If, however, by an act of sovereign power, private property is seized and confiscated, the question of compensation or indemnity is addressed not to the judicial, but to the legislative department. Whether the citizen is entitled to redress, and the measure of such redress, involve political considerations with which the courts have no concern. They may pronounce the act of seizure unconstitutional, aud they may decree restitution in cases falling within their appropriate jurisdiction. But they cannot annul a contract and relieve a purchaser of his obligation to pay, because the government by usurpation and violence has confiscated the property purchased, without making just compensation. They can no more discharge an obligation to pay for a slave emancipated than for a horse, or any other chattel taken by the government agents, or seized by invading armies. The purchaser of a slave long before the war may with equal propriety claim an abatement of the purchase money, upon the ground of a failure of title and consideration by act of the government. If he has already paid, he would, for the same reason, be equally entitled to recover back such share or proportion of the purchase money as would compensate him for the loss sustained.
To these results we are inevitably conducted by the proposition of appellant’s counsel. The entire argument is based upon a misconception of the effect of a warranty. Take the case of the sale of a slave made during the war, with the usual covenant that “he is a slave for life.” What is the effect of these words? Simply that the negro sold had then no valid claim to freedom, with either a present or future right of enjoyment; that his political and personal status was that of a slave under the constitution and laws as they then existed. The vendor did not mean to warrant that the laws allowing slavery would never be changed. Whether emanci *480 pation was effected by the conquest and subjugation of South, or by operation of the constitutional amend-m-en^ ^ was an a°t- of supreme power—of sovereign authority. It can scarcely be supposed the vendor intended to give, or the vendee to require, a warranty against the exercise of such sovereign authority. It wap doubtless upon this principle the case of Osborne v. Nicholson was decided. Here the plaintiff sued on a note given in 1861, the consideration of which was a negro slave, warranted a slave for life. Art. 15, § 14, of the constitution of Arkansas, which went into operation in 1868, forbids any recovery on such contracts, and accordingly the Supreme court of that State gave judgment for the defendant. Upon an appeal to the Supreme court of the United States, it was held that the contract being valid when made, was enforceable in the courts, and that the emancipation of the slave being an exercise of sovereign power by the State, was not a breach of the warranty, and did not invalidate the contract.
Let it be conceded, however, that a citizen may insure against the act of his government. It is not to be presumed that he intended to do so. To warrant such an interpretation of the contract, the language should’ be plaiu and unequivocal. It ought to appear that he had reference to such a contingency. To construe the ordinary formulas used in contracts of sale as constituting such warranty, would be to violate the settled rules of construction, and to impose upon the vendor a liability never contemplated by either of the parties. Ho one will seriously maintain that in a conveyance of real estate a warranty of title or covenant for quiet enjoyment, will be held to be broken by the exercise of the right of domain on the part of the State. The reason is, that in the sale and purchase of property parties are presumed to contract with reference and in subordination to the sovereign authority to divest the title of the owner when the public interests require it. Such conditions are always *481 implied in every sale, and must be presumed to be known to all, and i’ecognized by all, and are, therefore, never inscribed in the agreement of the contracting parties. Whether the power in any case has been constitutionally exercised or not; whether the property of the citizen has been arbitrarily wrested from him by violence and wrong without compensation, are questions between him and the government. They cannot affect or alter the liability of the vendor and convert his warranty into a policy of insui’ance against the act of the government.
These considerations apply with peculiar force to the sale of slaves after the date of President Lincoln’s proclamation. After that period it was well understood in the South, that the success of the Federal arms would be the doom of slavery. All classes of society appreciated this peril to which they were exposed. Parties bought and sold and partitioned estates in view of this contingency. With many confident in the expectation of ultimate success, this species of property was considered the best investment which could be made. By othei’s who held to the idea, that when the cause was lost all else was lost worth having, slave property was regarded as safe and valuable as any other in the States south. Others again made large purchases from the necessities of their position or a desire for speculation and gain. Whatever may have been the motives of purchasers, it is impossible to say, that either party understood that the loss of the slaves by the results of the war would effect the obligation of the contract. If it was so understood it was expressed in the agreement by words of plain and unambiguous import. These considerations, it seems to me, effectually dispose of the argument in respect to the failure of consideration. If there has been such failure, it was not because of any defect in the title of the vendor at the time of sale. It is the title of the purchaser that was destroyed, not that of the seller. If the slave had escaped, or had been taken from the possession of the *482 purchaser by superior numbers within a short period after the sale, the result would have been the 'same. In either case the purchaser acquired all he contracted for, but his enjoyment was not commensurate with his expectations. His title was perfect, but it furnished no security against the might of conquering armies.
In the present case there caunot be the shadow of a difficulty. The slaves were purchased at a judicial sale, as to wffiich the doctrine of caveat emptor applies in all its strictness. The appellants purchased with full knowledge of all the facts, and they assumed all the risks attending the acquisition of this species of property in the then existing condition of the country. The appellant’s intestate was on.e of the parties plaintiffs in this suit, asking for a sale of the slaves upon the ground that partition could not be conveniently made. The appellees were infants and non-residents at the time, taking no part in the suit, and probably ignorant of its existence. In no view can they be held responsible for the loss sustained by the purchaser. I think, therefore, the Circuit court did not err in refusing to vacate the bonds executed by appellant’s intestate for the price of the slaves sold under the decree of September 1863.
Although not entitled to all the relief asked for by him, the appellant has the right to have adjudicated the question as to the amount actually due by his intestate upon said bonds. It is true that judgments have been recovered thereon. The suit, however, is still pending in the Chancery court, which has complete jurisdiction to ascertain and'settle the rights of all the parties before the court. It cannot be precluded from so doing by the fact of the rendition of judgments upon the bonds given by the purchaser under its own decree. It is claimed by the appellant, that contracts were entered into with reference to Confederate States treasury notes as a standard of value, and the bonds are payable in that currency; and this is denied by the appellee.
*483 As the latter have the evidence afforded by a judgment in their favor, and as there is no positive proof in the record showing the kind of currency stipulated to be paid, or with reference to which the purchase was made, it would be premature in this court to undertake now to decide these matters of controversy. The appellant should, however, have an opportunity of establishing this ground of defence. As this point wTas not distinctly presented in the court, nor any claim to relief based upon it, this court can only affirm the decree with costs, with directions that an enquiry be instituted in the Circuit court, if desired by either of the parties, as to the kind of currency in which the bonds are payable, or with reference to which they were entered into as a standard of value.
Decree affirmed.