JENNIE ERWIN v. WILLIAM NOLAN et al., Appellants.

Division Two, January 6, 1920.

1. **CONSTITUTION**: Manner of Amendment. A State Constitution can be amended only in the manner by it prescribed. Where the Constitution of 1820 declared that it could be amended only by the affirmative vote of two-thirds of the members of both houses of the General Assembly at two successive sessions, the Convention of 1865, called to consider amendments, had no power to make an ordinance a part of the Constitution by the mere adoption and promulgation of it.

2. ———: ———: Manumission Ordinance of 1865. The ordinance declaring slavery abolished, adopted and promulgated on January 11, 1865, by the convention called to consider such amendments to the Constitution as may be deemed "necessary for the emancipation of slaves," was void, because the convention had no power to make it valid. The convention was not invested with legislative powers, and if the ordinance be considered an amendment to the Constitution it was invalid because it was not added thereto by the method of amendment prescribed by the Constitution of 1820, or submitted to a vote of the people for their approval.

3. ———: ———: ——: Retrospective Operation. Nor can the emphatic declaration abolishing slavery contained in the Constitution of 1865, adopted by the people on June 6, 1865, and effective July 4, 1865, be given such retrospective operation as to make valid the Manumission Ordinance of January 11, 1865, framed by the same convention, since the constitutional provision contained no reference to the ordinance.

4. ———: ———: Convention Elected by People: Superiority to Legislature. The fact that the delegates to the Convention of 1865, called by the Legislature to "consider" such amendments to the Constitution "as may be by them deemed necessary for the emancipation of slaves" or "necessary to preserve the purity of the elective franchise to loyal citizens" or "essential to the promotion of the public good," were elected by the people, did not make the convention superior to the Legislature, or vest it with legislative power, or give to its promulgated ordinance the character of a law or of an amendment to the Constitution. The convention derived its power from the people, but the power conferred was limited by the people to the terms of the legislative enactment under which its members were elected.

5. ———: ———: Legislative Recognition of Invalid Ordinance. Recognition in the preamble of the Act of February 20, 1865, to

26—280 Mo.

the Manumission Ordinance of January 11, 1865, which was an invalid attempt to amend the Constitution, gave no validity to the ordinance. [Overruling Thomas v. Mead; 36 Mo. 1. c. 242, in so far as it upholds the validity of the Ousting Ordinance promulgated by the same convention.]

6. **SLAVERY: Abolition.** Neither the Act of Congress of July 17, 1862, nor the presidential proclamations of September 22, 1862, and January 1, 1863, had any legal effect upon the legal status of slaves in Missouri. The legal emancipation of slaves in this State was effected by the adoption of the Constitution of 1865 on June 6, 1865, and prior thereto their legal status was not terminated.

7. **CHILDREN OF SLAVES: Born February 18, 1865: Inheritance of Property.** Under Section 344, Revised Statutes 1909, providing that "the children of all parents who were slaves, and were living together in good faith as man and wife at the birth of such children, shall be deemed and taken to be the legitimate children of such parents," a girl born of such parents on February 18, 1865, is entitled to inherit from such parents dying intestate, although, on January 11, 1865, the constitutional convention had by invalid ordinance undertaken to emancipate slaves.

8. ———: **Failure to Solemnize Marriage Relations.** The Act of February 20, 1865, requiring former slaves to solemnize their antecedent marriage relations and prescribing penalties for failure to do so, did not abrogate the relationship, or make illegitimate their children born in slavery.

9. ———: **Marriage: Subsequent Acknowledgment: Legal Contract.** If persons in bondage were married according to the usages established for the marriage of slaves and lived together as husband and wife, their acknowledgment of the relation after their emancipation completed the act of matrimony so as to make them lawfully married from the time they began to live together as husband and wife. A legal contract of marriage may be inferred from evidence establishing such facts.

Appeal from Jackson Circuit Court.— *Hon. Kimbrough Stone*, Judge.

AFFIRMED.

*Roland Hughes* for appellant.

(1) During slavery there could be no such thing as a marriage between the plaintiff's mother and Louis Nolan. Reeves on Domestic Relation, 341; Howard v. Howard, 6 Jones (51 N. C.) 235 and 236; Malinda v. Gardner, 24 Ala. 719-724; Stewart v. Muchandler, 65 Ky. 278; Brown v. Becket, 6 D. C. 252; Johnson v.

Johnson, 45 Mo. 595; Keen v. Keen, 184 Mo. 373.   (2) Since the relation of husband and wife cannot exist between slaves, the fact that they have continued to live together after emancipation cannot raise a presumption of marriage as in other cases.   Williams v. State, 44 Ala. 24; Brown v. Beckett, 6 D. C. 253; Pain v. Pain, 37 Mo. App. 110; Keen v. Keen, 184 Mo. 373 and 374.   (3) This being true, the plaintiff could only inherit by virtue of Sec. 344, R. S. 1909 (passed February 8, 1865; see G. S. 1865, p. 519.)   (4) To bring herself within the terms of this statute, it was necessary for her to prove that her mother and Louis Nolan were slaves living together in good faith as man and wife at the time of her birth.   G. S. 1865, p. 519, sec. 13. (5) The uncontradicted testimony of unimpeached and unimpeachable witnesses of both plaintiff and defendant is that she was born after slavery was abolished in Missouri, and the court erred in refusing to instruct a verdict for defendants.

*John G. Paxton* and *William B. Bostian* for respondent.

(1) The claim of respondent to be the child and heir of Louis Nolan primarily rests on Sec. 344, R. S. 1909.   (2) Apart from this statute, a subsequent cohabitation after emancipation by a man and woman who had been living together as husband and wife in a slave marriage would operate to create a common law marriage, and render legitimate the children of said marriage born after emancipation.   Lee v. Lee, 161 Mo. 57; Daniel v. Sams, 17 Fla. 487; Johnson v. Johnson, 45 Mo. 595.   (3) To aid in the construction of the law maintained by respondent, there is the presumption in favor of legitimacy.   Mair v. Brock, 222 Mo. 100.   (4) The statute (G. S. 1865, sec. 459) requiring registration after emancipation of negroes living as husband and wife in slavery, did not in express terms nullify marriages not registered.   It has been held to be directory, and not to nullify the marriages of couples

not registered.    Renfrow v. Renfrow, 60 Kan. 277;
Long v. Barnes, 87 N. C. 329; 19 Am. & Eng. Ency.
Law, 1171, note 2.    This collates all the authorities.
State v. Bittick, 103 Mo. 183.

WALKER, C. J.—This appeal arises out of an
action brought in the Circuit Court of Jackson County
under Section 2535, Revised Statutes 1909, to try and
determine the title to certain land in said county de-
scribed in the petition.    Louis Nolan, who is the com-
mon source of title, died seized of this land in December,
1915, intestate.    Respondent claims title as his daugh-
ter, and the appellants as his nephews and nieces.

The petition is at law and in the usual form.    The
answer admits that the appellants are in possession of
the land, and while admitting the paternity of the re-
spondent, alleges that she is illegitimate and hence in-
capable of inheriting from her father and that they are
his sole heirs.

Upon a trial before a jury there was a verdict for
respondent and a finding that she was the legitimate
child and heir of Louis Nolan and as such entitled to
the land.    From the judgment rendered thereon this
appeal was prosecuted.

The parties litigant are negroes.    The testimony
of the witnesses for the respondent was to the effect
that some time in the year 1864, more than nine months
before the birth of respondent, Louis Nolan, then a
slave and living with his owner in Jackson County, went
to the residence of the owner of Mary, the mother of
respondent, also a slave, who lived in the same neigh-
borhood, and asked if he could have her for his wife.
The owner gave his consent, and, in the language of a
negro woman then present, "He got a big book and
with his wife and Louis went to the kitchen where Mary
was at work."    Thereafter Louis visited Mary twice
a week, frequently bringing her meat, eggs and other
things.    During his visits he slept with her, and when
the respondent was born, on the 18th day of February,

1865, and thereafter, he called her his daughter and in time she called him daddy.

He was frequently heard to declare during this time and subsequently that Mary was his wife and that the respondent was his daughter.

The testimony for the appellants, while not directly contravening the testimony for the respondent, is to the effect that they knew Louis Nolan during all of the time stated by the witnesses for the respondent and that his conduct and declarations were such as to indicate that he did not regard Mary as his wife or the respondent as his daughter.

So far, however, as the conduct and declarations of Louis and Mary are concerned, they are confirmatory of the conclusion that they regarded each other as husband and wife and that this relation subsisted between them during the remainder of their servitude and for some time after their emancipation, if not up to the date of the death of Mary, which occurred several years prior to the death of Louis.

There was no evidence of a ceremonial marriage and it is contended by the appellants that (1) as the parties were incapable of contracting they could not enter into and consummate a common-law marriage; (2) that in the absence of this relation the usual presumption of marriage arising from conduct and cohabitation does not obtain; (3) that the salutary statute (now Sec. 344, R. S. 1909) legitimizing the issue of such persons can have no application because, by its terms, it is limited to issue born while such persons were in a state of slavery, which status, as alleged by appellants and tacitly admitted by respondent, was abolished by this State on the 11th day of January, 1865, before the respondent was born, which was not until the 18th of the succeeding month.

The material portions of the statute referred to are as follows:

"The children of all parents who were slaves, and were living together in good faith as man and wife at

the time of the birth of such children, shall be deemed
and taken to be the legitimate children of such parents,
and all the children of any one mother, who was a
slave at the time of their birth, shall be deemed lawful
brothers and sisters, for the purposes of this article.''
[Sec. 344, R. S. 1909.]

If it be conceded that this section, so far as con-
cerns the legitimacy of respondent, is subject to the
construction placed upon it by appellants, the facts,
despite the concession of the parties hereto as to the
time when slavery was abolished in this State, do not
sustain this construction. It is true that on the 11th
day of January, 1865, an ordinance abolishing slavery
in Missouri was adopted and promulgated by a con-
vention, the defined province of which under the act
of its creation (Sec. 5, Act approved February 13, 1864,
Laws 1864, p. 24) was ''to consider, first, such amend-
ments to the Constitution of the State as may be by
them deemed necessary for the emancipation of slaves;
second, such amendments to the Constitution of the
State as may be by them deemed necessary to preserve
in purity the elective franchise to loyal citizens and
such other amendments as may be by them deemed es-
sential to the promotion of the public good.'' If the
Constitution of the State then in force authorized the
Legislature to provide for the election by popular vote
of delegates to a convention which was, under the act
of its creation, declared to possess the plenary power
of the whole people, then the right of such a conven-
tion to adopt, not only an effective ordinance abolishing
slavery, but any other which did not contravene the
Constitution, is beyond question. The Constitution then
in force and subsequent ones, differing only in phrase-
ology, have given express recognition to the fact that
the people are the source of all power, in this language:
''The people of this State have the inherent, sole and
exclusive right of regulating the internal government
and police thereof and of altering or abolishing their
Constitution and form of Government whenever it may

be necessary to their safety and happiness.'' [Sec. 2, Bill of Rights, Constitution of Missouri of 1820.]

The power thus conferred is, from the terms employed, unlimited; but the people, in their wisdom, have usually in their organic law, always of their own making, prescribed limitations upon and defined the course to be pursued in the exercise of this power. Conformity with these requirements is as obligatory upon the whole people as is the duty of the individual to obey the law. Otherwise, the peaceful changes in constitutions or statutes could not be insured, the administration of the law would be interfered with and the perpetuity of civil government endangered. Well aware, as every student of civics must be, of the dangers incident to irregularity of action in matters affecting government, the framers of the Constitution in force when the ordinance in question was promulgated, incorporated into that instrument a method to be pursued in amending same, which cannot be construed as other than a modification of or limitation upon section 2, supra. It is as follows:

"The General Assembly may, at any time, propose such amendments to this Constitution as two-thirds of each house shall deem expedient, which shall be published in all the newspapers published in this State, three several times, at least twelve months before the next general election; and if, at the first session of the General Assembly after such general election, two-thirds of each house shall, by yeas and nays, ratify such proposed amendments, they shall be valid, to all intents and purposes, as parts of this Constitution: *Provided,* that such proposed amendments shall be read on three several days, in each house, as well when the same are proposed, as when they are finally ratified.'' [Art. 12, Cons. Mo. 1820.]

This article prescribes the only method by which the then fundamental law could be changed and is therefore exclusive. There was no compliance with its terms, and the validity of the ordinance cannot be predicated

upon the condition that it constituted an amendment to the Constitution which was framed by this convention subsequent to the adoption of the ordinance. The validity of the latter, however, was not asserted at the time of its adoption, nor in the subsequent declarations in support of same, to be dependent upon the assumption that it was an amendment to the Constitution. Nor can it be claimed with any regard for the rules of construction that the Constitution framed by this convention and which contained an emphatic declaration abolishing slavery but nothing further in regard thereto, can be construed to have a retrospective effect and thus give operative force to the ordinance which was dated January 11, 1865, while the Constitution was not adopted by the people until June 6, 1865, and by its terms did not become effective until the fact of its approval had been promulgated by the Governor on the 4th day of July, 1865.

Nor was it contended at the time or thereafter that the ordinance derived its validity from the subsequent recognition of its purpose in the Constitution. The position assumed by its supporters was more sweeping and was based upon general principles rather than rules of construction. It was maintained that the power of the Legislature to provide for the election of delegates to a state convention of the character here under review, could have no further effect than to prescribe the method of their election; that the Legislature, being wholly representative in its character, when it had provided for such election, became an inferior body to the convention, whose delegates when assembled represented the sovereignty of the whole people and hence were not limited in power by the act of the Legislature. The recognized validity of the acts of the former state convention held under the authority of the statute approved January 21, 1861 (Laws 1860-1861, p. 20), is urged as a reason by analogy in support of the validity of the ordinance in question. Not only were the conditions dissimilar under which these two conventions were

held, but the purposes and powers of each, as disclosed by the acts of their creation, were entirely different. The convention of 1861 was authorized "to take such action as the interest and welfare of the people may require" limited only by the provision that "no act, ordinance or resolution of said convention shall be deemed to be valid to change or dissolve the political relations of this State to the Government of the United States or any other State until a majority of the quali-fied voters of this State, voting upon the question, shall ratify the same."

The reasons for the creation of this convention while not disclosed by its terms, are familiar to every student of history. A spirit of unrest and antagonism towards the national government had been manifested by the executive officials and many of the people of the State following the result of the preceding presi-dential election. This attitude became more pronounced as time advanced. If it continued, it required no prescience to determine that it would result in disturb-ing if not destroying the then otherwise peaceful con-dition of public affairs. To avert such a calamity the Legislature, with the consequent approval of the people, created the convention and panoplied it with power equal to any emergency. Succeeding events demon-strated the wisdom of this course. The convention met from time to time without any effort to invade the province of any department of government, discussed every phase of the conditions which seemed to menace the public peace, passed resolutions, if we may say not flippantly, "as plentiful as blackberries" and adjourned not finally on the 22nd day of March, 1861, with the declaration solemnly expressed that it was the judg-ment of the people of the State "that there was no sufficient cause for disturbing the relations existing be-tween the State and the national government." De-spite this declaration the attitude of the executive of-ficers and many members of the General Assembly towards the Federal Government as then conducted

continued, resulting in June, 1861, in the Governor and other officers, including members of the Legislature, abandoning their offices and fleeing from the State capital. This left no magistracy to exercise the powers conferred upon it by law to maintain the peace of the State and the security of the people. The convention thereupon met and proceeded to organize a provisional government, which, after electing executive officers, began to exercise the functions and powers of a legislative body, the result of their action being designated as "ordinances." The wisdom of this course is apparent and the actions of the convention justified if upon no other ground, than the necessity to restore and preserve the peace of the State and the security of the people.

However, the conditions existing at the time the ordinance in question was adopted by the convention of 1865 were entirely different. The provisional government had, upon the securing of an orderly condition of affairs, passed out of existence, and upon the election of all the authorized state officials at the general election in 1864 there remained no reason or necessity for the exercise of any other power than that expressly conferred by the Constitution and the laws of the State. The Governor and other state officials were in the exercise of their various duties and the General Assembly was in session. In the absence, therefore, of any necessity for extraordinary action and in the presence of a peaceful and orderly condition of affairs there was no ground for the creation of the convention of 1865 other than the purpose specified in the act. That purpose, and that alone, was to propose or, to employ the language of the act, "consider" amendments to the Constitution. In the orderly condition of public affairs then existing, of which there can be no controversy, no other possible purpose could reasonably be said to have existed for conferring or attempting to confer greater power upon this convention than that expressed in the act. Moreover, the claim as to the superior power of

this convention over that of the Legislature is a mere flourish of words and will not stand the test of analysis. The Legislature, within its own province, as defined by law, is supreme. To no greater extent is a convention, which, like the Legislature, must derive its power from the law. That the convention derived its power from the people is true, but the power thus conferred was limited by the people themselves to the terms of the legislative enactment under which the members of the convention were elected. If this limitation, or some other which defined the purpose of the act, had not been embodied therein, no reason would have been presented for requiring the people to vote upon the selection of delegates to the convention. In the absence, therefore, of this or some other prescribed purpose, the act would not only have been futile, but absurd.

An act of the Legislature approved February 20, 1865 (Laws 1864-1865, p. 63), the purpose of which was to confer personal and property rights upon slaves, attempted in its preamble to give legislative recognition to the ordinance in question. The effect of the ordinance was, if valid, to amend the Constitution; we have shown that in its adoption by the convention the course prescribed to accomplish that purpose was ignored. The legislative act therefore was nothing more than an effort to give recognition to an abortive attempt to amend the organic law—legislative conformity with the latter is a prerequisite to the validity of all statutes.

In Thomas v. Mead, 36 Mo. l. c. 242, judicial recognition by assumption is given to what is termed the "ousting ordinance" adopted by the same convention which promulgated that under review. The same rules which apply to the one are applicable to the other; and incidentally, but as necessary to the determination of the matter at issue, we may say that the ousting ordinance is subject to all the infirmities we have attributed to that in question. No reasons are given or conclusions attempted to be adduced by the court in its

opinion by HOLMES, J., in the Mead case as to the validity of the ousting ordinance. It simply assumes that the convention was clothed with supreme power and that the public was bound by its action. This falls short of defining a reason for the court's conclusion and establishes no principle upon which the ordinance can be construed to be valid. It is therefore no authority in favor of the power of the convention to enact the ordinance and does not rise to the dignity of a precedent.

The Act of Congress of July 17, 1862, did not undertake to free even all of the slaves of persons then in rebellion against the Government; but it was limited to the slaves of such persons "escaping and taking refuge within the lines of the army, and all slaves captured from such persons or deserted by them or found or being within any place occupied by rebel forces and afterwards occupied by the forces of the United States, were to be deemed captives of war and thereafter free of their servitude." [Weaver v. Lapsley, 42 Ala. 601, 94 Am. Dec. 671.]

The presidential proclamations of September 22, 1862, and January 1, 1863, did not have any effect upon the legal status of slaves in Missouri; by their terms these proclamations were restricted in their application to persons held as slaves in a state or part of a state then in rebellion. Missouri was not at the time of the proclamations or thereafter in that category; and if it had been the proclamations were, as their language indicates, war measures definitive of the attitude of the President on personal liberty, but worthless as affecting any legal status unless carried into effect, and even in a state in open rebellion of no potential force until it had been conquered and the people rendered subject to the national law. [Henderlite v. Thurman, 22 Grat. (Va.) 466, 12 Am. Rep. 526; McElvain v. Mudd, 44 Ala. 48, 4 Am. Rep. 106.] In consonance with this conclusion the Supreme Court of the United States in the Slaughter-House Cases (16 Wall. 36, 21 U. S. Law Ed.

394) held that slavery was not legally abolished in the United States, whatever may have been the material status of the slaves in any particular state, until the adoption of the Thirteenth Amendment to the Federal

If, therefore, the binding force and effect of state constitutions and statutes upon property rights be waived, no refuge from the charge of invalidity in the ordinance can be found in the acts of Congress or presidential proclamations.

From all of which the conclusion is authorized that whatever may have been the actual condition of slaves prior thereto, their legal status as such was not terminated in Missouri until the adoption of the Constitution of 1865. Under the construction of appellants, therefore, the respondent was born while her parents were in a state of bondage and her rights of inheritance are clearly established by what is now Section 344, Revised Statutes 1909.

The character of this statute, however, and the purpose of its enactment authorize a broader construction than that given to it by the appellants. As we said in effect in Wiley v. Harlow, 274 Mo. l. c. 176, "this statute must be construed so as to subserve its beneficient intention of remedying an unfortunate situation so far as is consonant with good morals and dignity." The intention thus referred to is the legitimation of the children of those who had been slaves. The initial tests of its application are cohabitation, commenced in bondage, accompanied by the other material similitudes of the marital relation as sustained between free persons and continued in good faith by the parents up to the birth of the child. Present these requisites, all others necessary to the existence of a marriage under different conditions need not, in the construction of Section 344, supra, be taken into consideration. The correctness of this conclusion is not disturbed by the statute approved February 20, 1865 (Laws 1864-1865, p. 67), which provided penalties for a non-compliance with its require-

ments and is applicable by its terms "to persons of color theretofore held as slaves who had cohabited as man and wife." This statute, while requiring former slaves to solemnize their antecedent marriage relations as therein required and prescribing penalties for a failure so to do, does not attempt in implied or express terms to abrogate the relationship. If so construed it would completely destroy the purpose of Section 344, supra, in that it would upon a conviction result in impliedly establishing a condition of concubinage, which all statutes affecting the marriage relation and the consequent legal standing of the child seek to avoid.

While we hold here as elsewhere that marriage, being in the nature of a contract, cannot be legally consummated by persons incapable of contracting, we likewise hold that if in attempting to enter into the marriage relation the slave, although his act lacked technical validity, violated no legal duty; and if after emancipation there was confirmation, by cohabitation or otherwise, substantial grounds would exist for declaring the marriage binding. If, therefore, persons in bondage lived together as husband and wife and during that status were married according to the usage established for the marriage of slaves, their subsequent mutual acknowledgment of the relation after their emancipation should be held to complete the act of matrimony so as to make them lawfully married from the time when their living together as husband and wife commenced. [Johnson v. Johnson, 45 Mo. l. c. 601.] The Legislature doubtless in the enactment of Section 344, supra, recognized the rule as thus announced and hence embodied only the requisities prescribed therein.

In Lee v. Lee, 161 Mo. 52, in an illuminating opinion on this subject by VALLIANT, J., we held in effect that under this statute the children of all persons who were slaves and who were living together in good faith as man and wife at the time of the birth of such children are deemed to be legitimate and that the words "good faith" as employed in said statute do not mean that

such slaves should have had the power to make a marriage contract, but it should appear that they have agreed to enter upon the marriage relation. The existence of such an agreement may not be susceptible of direct proof, but may be implied from the conduct and declarations of the parties, as in other cases. [Renfrow v. Renfrow, 60 Kan. l. c. 281; Francis v. Francis, 31 Grat. (Va.) 283; McReynolds v. State, 5 Coldw. (Tenn.) 18.]

In the instant case there was no positive proof of a direct agreement between the parties to occupy the relation of husband and wife but there was substantial evidence of this fact from their conduct and declarations. The jury found this to be sufficient to sustain a verdict in favor of the respondent and we are not authorized, so far as the testimony is concerned, to disturb it. [Koehler v. Rowland, 275 Mo. 573.]

Under these rulings the conclusion is authorized that the respondent may, under this statute, be declared legitimate although born before the emancipation of her parents. To hold otherwise would destroy the uniformity of the application of the statute and render possible a harsh or unfair discrimination between the children of the same parents, in that it would authorize the holding of those born while the parents were in a state of bondage to be legitimate, while those born after emancipation would be bastards. Neither reason nor rule will sustain such an interpretation.

In the Lee case, supra, we held where slaves had assumed the relation of husband and wife with the consent of the master that such consent supplied the technical power they lacked to contract and hence the relation thus begun would constitute a consensual or common-law marriage; this, in our opinion would, although it is not necessary to so decide, authorizes a holding in favor of the legitimacy of respondent as an issue of such a marriage and her consequent right to inherit from her father.

Our construction of the statute (Sec. 344) is determinative of the correctness of instruction numbered

one given at the request of the respondent and the re-
fusal of instruction numbered two asked by appellants.

From all of which it follows that the judgment of
the circuit court should be affirmed and it is so order-
ed.

All concur.